15549

TOWN OF MYRTLE BEACH v. HOLLIDAY, TAX COLLECTOR,
*ET AL.*

(26 S. E. (2d), 12)

*Messrs. Wright & Burroughs,* of Conway, S. C., Counsel for Petitioner,

*Attorney General John M. Daniel* and *Mr. Claude K. Wingate,* both of Columbia, S. C., Counsel for Respondents,

June 7, 1943.

Mr. Associate Justice Baker delivered the unanimous opinion of the Court:

By permission this action was instituted in the original jurisdiction of this Court.

The agreed statement of facts and the respective positions of plaintiff and defendant are:

"1. F. G. Holliday is Tax Collector for Horry County; Myrtle Beach is a South Carolina municipal corporation situate in Horry County, and W. G. Query, J. P. Derham and Francis M. Pinckney are members of and constitute the South Carolina Tax Commission, which commission has authority to abate the taxes which are subject to this action.

"2. On May 29th, 1941, the South Carolina Utilities Company, a corporation, conveyed to the Town of Myrtle Beach certain real and personal property which constituted its water works system at Myrtle Beach; and said town, since the date of said conveyance, has owned said property and operated the same as its own water works system.

"3. All state and county taxes have been paid on the property for the years up to and including 1940, but taxes for the year 1941 have not been paid.

"4, F. G. Holliday, as Tax Collector for Horry County, holds tax execution No. 17,340, representing taxes claimed

to be due for the year 1941 in amount of Twenty-three Hundred Nine and 82/100 ($2,309.82) Dollars, before issue of execution, and in amount of Twenty-five Hundred Ninety-eight and 09/100 ($2,598.09) Dollars, with interest and penalties as of this date. The said execution includes only the tax upon the valuation of the water works system conveyed to the Town of Myrtle Beach and all of which is located within the corporate limits.

"5. The Town of Myrtle. Beach has applied to the South Carolina Tax Commission for an abatement of the tax referred to in the preceding paragraph, but the commission refuses to issue its order of abatement.

"6. The town takes the position that upon its acquisition of the water works system on May 29th, 1941, all taxes then or thereafter due upon that system for the year 1941 were immediately cancelled and the lien of such taxes immediately discharged. If that position be held to be incorrect, the town takes the secondary position, that, in no event, would the property be subject to lien for taxes accruing after May 29th, 1941, and that it would be entitled to a porportionate abatement. The town assumed payment of any taxes which were collectible.

"7. The commission and collector take the position that, since the property was owned by a private corporation on January 1st, 1941, and was returned for taxation by that corporation, the state and county have a valid subsisting lien upon the water works system for the full amount of tax for the year 1941."

The questions involved are:

"1. Has all state and county tax on the water works system at Myrtle Beach, South Carolina been cancelled and the lien thereof for the year 1941 extinguished as the result of acquisition of title thereto on May 29th, 1941 by the Town of Myrtle Beach?

"2. If the lien for the entire year of 1941 is not extinguished, is the town liable to tax for more than the portion

of the year during which the property was owned by South Carolina Utilities Company?"

It is agreed that if either of the foregoing questions should be answered in the affirmative, the Court may issue its writ of mandamus to W. G. Query, J. P. Derham and Francis M. Pinckney, members of and constituting the South Carolina Tax Commission, directing them to abate all or such portions of taxes as the Court may find should be abated.

The precise question involved, indeed, even an analogous situation, does not seem to have been passed upon by the Courts of this State.

As stated by plaintiff in its brief, if the present owner of the property were a private citizen or corporation, Sections 2569 and 2571 of the Code of 1942 would undoubtedly apply, but it is contended by plaintiff that said sections have no application to the question at issue, and we are in accord with this contention.

Section 2715 of the Code of 1942 reads in part as follows: "Each county auditor, after receiving from the Comptroller General and from such other officers and authorities as shall be legally empowered to determine the rate or amount of taxes to be levied for the various purposes authorized by law, statements of the rates and sums to be levied for the current year, shall forthwith proceed to determine the sums to be levied upon each tract and lot of real property, and upon the amount of personal property, moneys, and credits listed in his county, in the name of each person, company, or corporation, which shall be assessed equally on all real and personal property subject to such taxes, and set down in one or more columns, in such manner and form as the Comptroller General shall prescribe * * *."

It will therefore be seen that an assessment of the taxes cannot be made until the county auditor receives instructions from the Comptroller General, and of course such instructions cannot be given until the State appropriation bills

and the county supply bill for the year have become acts of the Legislature.

In that the State appropriation bills for the year 1941 were not approved until May 20, 1941; and the Horry County supply bill for the same year was not improved until May 27, 1941, it is a safe assumption that the Comptroller General had not issued his instructions to the auditor of Horry County and the auditor had not placed an assessment on the property prior to its acquisition by plaintiff on May 29, 1941.

Section 2774 of the Code of 1942 provides that all taxes are payable between the 15th day of September and the 31st day of December after their assessment in each year.

Therefore, at the time plaintiff acquired this property, the tax for the year 1941 had not been assessed, and was not due and payable.

Section 4, Article X of the State Constitution of 1895, exempts from taxation all municipal property used exclusively for public purposes and not for revenue; and Section 2578 of the Code of 1942 exempts from taxation all waterworks to supply water for the use of a town or city, the machinery and fixtures connected therewith, and the grounds occupied thereby, when owned by any city or town. This being so, how could there be an effective levy made against this property when the property was conveyed to plaintiff before the tax levies for the year became effective? It is quite true that if there is a valid levy the lien would relate back to the beginning of the year, under Section 2569 of the Code, but unless there is a valid levy there is nothing to relate back. We quote the following from 61 C. J. 924-925: "While a statute which definitely fixes the date or time when the lien shall attach, does not do away with the necessity of the necessary steps to be taken before such lien can become effectual, the lien dates back and takes effect by relation from the date or time fixed by the statute. * * *"

We further quote from 61 C. J. 406: "For the purpose of determining whether or not property is exempt from taxation for any year, its status in jurisdictions where all taxable property is required to be assessed at a particular date is to be taken as of that date, so that when a constitutional or statutory provision exempting property from taxation goes into operation on a certain day in the year before the taxes for that year have been assessed, or before the day when by law they become a fixed charge on the property, the exempted property is free from the taxes for the current year; * * *."

In *State v. City of Columbia,* 115 S. C., 108, 104 S. E., 337, 338, the distinction between exemption of an individual and exemption of a municipality from taxation is considered, the Court holding: "* * * The general rule is that exemptions of private property are strictly construed, because in such cases taxation is the rule and exemption the exception; but exemptions of the property of municipal corporations' are liberally construed, for exemptions of such property is the rule and taxation the exception. With us municipal corporations are merely agencies of the state for governmental purposes; and it has never been the policy of this state to tax its own agencies or instrumentalities of government. From which we conclude that the provision should be construed liberally in favor of the exemption claimed."

Applying a liberal construction of the foregoing statutory and constitutional provisions leads to the conclusion that the State of South Carolina and Horry County has only an inchoate lien for the taxes for the year 1941, on January 1st of that year, subject to be defeated if prior to the actual assessment of the property for taxes, and prior to the due date of such taxes, the property is acquired by a governmental agency whose property is exempt from taxation, and therefore not subject to be levied upon.

Not having a precedent in this State, we have natur-
ally resorted to a study of textbooks, and the deci-
sions of the appellate Courts of other states, and find
that with the exception of the State of Michigan, the rule is
that taxes assessed against property for the year in which
it is acquired by a political sub-division of the State, and is
being used by such governmental agency for public purposes,
the taxes so assessed in favor of the State upon the same
cease to be exigible.

In *State v. Snohomish County,* 71 Wash. 320, 128 P.,
667, 669, it is held that where taxes are, by statute, made a
lien on land against which the same are assessed from and
including the 1st of March, such tax lien is not enforceable
as to lands acquired by the State in August of the same year,
and that hence tax certificates issued against said land are
null and void. The Court, after stating the general rule that
the general tax laws of the state are presumed to operate
upon private and not upon public property, said: "It seems
equally plain that the creation of a valid tax implies the ex-
istence of a susceptible subject of taxation at every stage
of the process of such creation. Since, on general principles
of public policy and by both constitutional declaration and
statutory enactment, lands while held in public ownership
are exempt from taxation, the land here in question was not,
during any step in the proceedings creating the tax after
August 9, 1907, when it passed to the state, a susceptible
subject of taxation. It follows that at that time the develop-
ing process of imposing the tax as a valid creation was ar-
rested." Annotation 2 A. L. R., 1537.

Probably the leading case on the subject under discussion
is *Gachet v. City of New Orleans,* 52 La. Ann., 813, 27 So.,
348, 349, decided February 19, 1900.

The City of New Orleans on July 6, 1885, purchased a lot
in said City from one Hoxie, and erected thereon an engine
house for its fire department, and used it as such. Prior to
1885, the lot had been owned by the estate of George P. Mc-

Connell, and Hoxie had acquired it from the McConnell estate some ten or twelve days only before he sold to the City. The City assumed payment of State and City taxes for the year 1885, looking upon the City's assumption of payment of the State taxes for 1885 as purely nominal, and that once the title had vested in the City, no claim for State taxes was enforceable against the property. The Tax Collector for that district took the opposite view, proceeded against the property and sold it, the title thereto under the tax sale finally reposing in Gachet, who brought action to be decreed the owner of the property. We quote at length from the opinion:

"From the foregoing statement of the case the legal conclusions determinative of the controversy are easily deducible. When the city of New Orleans purchased the lot, one-half only of the year 1885 had elapsed, and it cannot be said the state taxes for 1885 had yet become due and exigible. The taxes for 1885 did not become due until the tax roll of that year had been deposited in the office of the mortgage record, and by section 32 of Act No. 96 of 1882 this deposit of the tax roll was not required to be made before the last day of August of the year, and by section 7 of Act No. 107 of 1884 the tax roll for the city of New Orleans was not required to be furnished by the board of assessors to the tax collector before the 1st of October of the year, which assessment roll, the statute declared, should serve as the basis for the state and city taxes for the year in which the same was made. By section 8 of Act No. 107 of 1884 the board of assessors for the parish of Orleans was given until July 31st of each year in which to complete the assessment of property for taxes, and after such completion the rolls were, by direction of section 9 of the statute aforesaid, to be submitted to the assessment committee appointed by the city council for its inspection and review; and this committee on assessments was not required to meet for this purpose until the second Monday in August of each year. The effect of these provi-

sions of the law is to show that when the city acquired title to the lot of ground in controversy the assessment of the same for state taxes for the year 1885 was not even in a completed state, much less were any taxes for 1885 then due on the property.

"Nor did such taxes for 1885 become delinquent until after December 31, 1885. Section 40, Act No. 96 of 1882. No state taxes, therefore, on the lot for the year 1885 had yet matured and become demandable when the city purchased, and all state taxes prior to 1885 had been paid. Before the state taxes for 1885 became due and demandable the property had passed out of the hands of private ownership into the hands of public ownership. Private ownership implies liability for taxes; public ownership, immunity from taxation. Property belonging to the city of New Orleans and used for public purposes is public property and owes no taxes. Const. 1898, Art. 230. The moment public ownership of the lot attached—the moment it passed from the hands of Hoxie to the city—developing liability to taxation was arrested; and in point of fact and law the state taxes for 1885 on the lot, under the assessment made in the name of the estate of McConnell, Hoxie's vendor, never reached the point of maturity. The tax never became due or delinquent, and the lot could not be sold for taxes until delinquency had ensued. * * * 'the tax law of a state,' says Desty in his work on Taxation (volume 1, p. 48), 'applies to persons only, and not at all to political bodies like municipal corporations, which exercise in different degrees the sovereignty of the state.' Hence it is that when property upon which state taxes are assessed is acquired by a political subdivision of the state, like the city of New Orleans, to which certain powers of sovereignty and government have been delegated by the state, which property is acquired for purposes of public utility coming within the scope of the powers so delegated, and is immediately dedicated or applied to such purposes of public utility, the taxes so assessed in favor of the state upon

the same cease to be exigible. It pertains to the public policy of the state not to exact taxation on property so held and used. Within the scope of the powers delegated to it, the city stands for the state and property acquired by the city in the due execution of its mandate from the state stands in *consimili casu* with property owned by the state itself, and taxes assessed in favor of the state upon such property must be held abated. It is a commingling of the qualities of debtor and creditor in such way that there arises a confusion of right extinguishing the obligation. * * *

"The assumption of the city, in the act of purchase from Hoxie, of the payment of the state taxes for 1885, can be viewed as having no other effect than as a guaranty to Hoxie and his vendor, the estate of McConnell, that they would be held harmless as against any attempt on the part of the state to collect the tax from them or either of them. In this respect the city was to stand between them and the state. Such assumption can by no means be held as having the effect of authorizing the state to sell the lot for the taxes of 1885, if the city failed to pay the same, when the lot, by virtue of its acquisition by the city, assumed the character of 'public property,' entitled to immunity from pursuit for taxes assessed against it. If, without the city's assumption of the taxes in the act of purchase, the lot would be free from the pursuit of the tax gatherer, its assumption of the taxes did not lift the barricade and give the tax gatherer a free hand. The law alone must be looked to for his authority, and in the case of property becoming 'public property,' like the lot in question, his authority over it in the matter of the enforcement of taxes ceased."

It will be observed that the determining facts of the *Gachet case* are almost on all-fours with the case at bar. The reasoning of that case has been followed by the Courts of sister states, with one exception, as aforesaid, and appeals to us as logical and sound.

It is, therefore, ordered that a writ of mandamus issue from this Court, signed by the Clerk of the Court, directing W. G. Query, J. P. Derham and Francis M. Pinckney, members of and constituting the South Carolina Tax Commission, to abate all taxes on the property in question for the year 1941.

Petition granted.

MESSRS. ASSOCIATE JUSTICES FISHBURNE and STUKES and CIRCUIT JUDGE J. HENRY JOHNSON, ACTING ASSOCIATE JUSTICE, concur.

MR. CHIEF JUSTICE BONHAM did not participate.